Case No. 24-5172, Monty A. Rose, Jr., et al. v. Robert F. Kennedy, Jr., Secretary, United States Department of Health and Human Services, in its official capacity, et al., Indiana Family and Social Services Administration, et al. Mr. Bartos, for the et al., Mr. Boldy, for Appalachia, Robert F. Kennedy, Jr., et al., Mr. Redd, for Appalachia, Monty Rose, Jr., et al. Good morning. Good morning. May it please the Court, the Healthy Indiana Plan, or HIP, expanded Medicaid to cover hundreds of thousands of users while allowing all beneficiaries who make small, predictable contributions to power accounts to access benefits that traditional Medicaid does not provide, like vision and dental, and to avoid making unpredictable time-of-service copayments that would apply under traditional Medicaid. The Secretary reasonably determined that HIP would likely advance Medicaid's goals of allowing Indiana to continue providing greater coverage than would otherwise exist. In vacating the waiver, the District Court made three principal errors. First, it moved the statutory baseline for assessing projects, requiring the Secretary to explain why HIP was better than hypothetical alternatives rather than just why it would likely advance the statute's objectives. Second, it shifted its focus from the project as a whole to individual elements of that project. And third, it imposed a remedy that not only fails to redress the injuries alleged, but whose disruptive effects are out of proportion to the alleged error. But before I get to the merits, let me first address this Court's jurisdiction. In assessing the finality of orders, the Supreme Court has told us we must take a practical view of finality. And when it comes to remand orders, this Court has made clear that two types of orders that may be labeled a remand order are nonetheless final. Orders that effectively terminate the action, or orders where there is a danger that the party injured would not have an opportunity to appeal later. And here we have both. As for effectively terminating the action, the order vacates the 2020 approval, giving plaintiffs full relief on Count 1. And there is nothing more the District Court could do with respect to Count 1 of the complaint, because all that Count 1 challenges is the 2020 approvals, not individual elements of that approval. That's going to be true often in remands. That is exactly what the plaintiffs ask for. So in that sense, it will be full relief. But the whole rationale of this doctrine is that, well, we'll see what you get on remand. They're going to revisit the issue. And either side, Indiana as well as the other side, will have the opportunity to challenge that decision once it issues. There will be a new decision on remand, but any future litigation about that decision is not about the 2020 approval. And I think that's one of the critical— Why does that matter? So I think that's one of the—in two ways, Your Honor. First, as to when we're looking what effectively terminates the action, we first have to ask, what is the claim on which the District Court entered the Rule 54b judgment? And the claim here, as the District Court noted, is about the 2020 approval and that approval only, not individual elements who continue to be disputed or litigated on remand. And I think the second reason goes into, can this effectively be reviewed later? Here, any future litigation is going to concern the new agency action. I think the concern is that your argument just describes the exact prototypical case we've said isn't appealable. Every time a District Court vacates an action and remands to see if that same action can be justified, that's sort of the baseline situation in which we say it's not appealable. So I think you need a reason that this case is different from that, don't you? So I think there are two reasons. The first goes to, does this effectively terminate the action? I think given how the boundaries of the actual claim that issue count one, that this is very much like the American Great Lakes case where there was going to be continued litigation about the rulemaking, but because of how the count on appeal was framed, the court said the order effectively terminated the action with respect to that count. And as to the, you know, the second piece of it, which is the, can this be appealed later? Yes, there may be future litigation about KIPP in general, but not the 2020 remand. And there's a chance that any future litigation about this may not even occur in this circuit if there's a denial on remand. But after the remand, if you want to appeal, you can appeal the new proceedings after remand, and you can also appeal the remand order that said it there. So I don't understand why you wouldn't be able to appeal this later. So I don't think that's true if there is a denial of the approval on remand, because Indiana would be entitled to challenge that in the southern or northern district of Indiana. Any appeals would go to the Seventh Circuit. And at that point, I think this action would likely be moved. There would be nothing further to do, nothing further that the district court could set aside. A precedent for that? Because I don't think that's the way it works. I think the precedent is to say that you can challenge the remand order. So I think we cite a Seventh Circuit case in our brief. I think Travis is the name that says that when you have a new agency action, at least in the Seventh Circuit, they're going to consider the old agency action, any litigation about that moved. And I think that shows exactly the dilemma we are in. But I also just, I mean, you know, it's not uncommon, and this happens often during presidential transitions, that matters are sent back to agencies because the agency says, as I have here, we're going to look at this again. And especially if they say, we're going to make a new decision, as they have here. At a fair minimum, we would hold the case in advance rather than rule upon it, because it's a waste for us to issue what everyone knows is going to be an advisory opinion on the lawfulness of agency action A, when they've already said, forget about it. We're going to do agency action B. So I don't understand why we would spend the resources and then, you know, either they come out with a decision before we do, at which point it's all wasted, or we come out of it right before they do, at which point it's all wasted. Well, I think, Your Honor, that goes maybe to a prudential concern about whether you set briefing in a case or not, but not the issue of finality, which is determined at the time the agency action issues. Are you happy if we just hold it in advance? Your Honor, I think… I don't know how that helps the concerns that you're raising, so it seems to me it gets to the practicality. You're talking about a practical effects doctrine here, and if it makes no sense for us to reach out and rule under the arguments that you're advancing, which simply sort of echo the problems with this remand rule. So I think, Your Honor, that would go to some of the practical concerns about, you know, what happens with, you know, do you lose the chance to appeal at all? But I don't think it addresses other practical concerns. What do you think would happen to that appeal if we hold it in advance and then they issue a whole new decision? Well, I think… What are the chances we would then say, well, we still need to decide this? Of course we wouldn't. Well, now I think the court would need to decide this appeal because that is the… No, we would… There's no point to that. It would get you nowhere. You would still have to do with denial B. It would do nothing to remedy you, your injury, if we say maybe they were wrong about denial A, that it was actually perfectly lawful because they now have a whole new decision in place. And then if there's a denial, that litigation might not even occur in this court, which means that the district… I don't understand what the relevance of that point is. Well, I think it goes to the district court's decision not being effectively reviewed, including, and I think this is significant… Your choice. I mean, or the plaintiff's choice, whoever's choice it is. There's no guarantee that every district court decision ultimately gets reviewed if parties choose to challenge a subsequent agency action somewhere else. That's just how the world works. Well, Your Honor, I think that we're not saying that every ruling that might come in the course of the case can immediately be appealed. But rather, you know, one of the significant pieces about this is this is not just remand. It vacates the agency action. So, there are going to be consequences that… So, what rule are you actually asking us to adopt here? Are you saying that all remands that vacate agency action are not final? Because in general, remands are not final decisions. So, what are you saying? Is it because Indiana is a state? Is it because any remand where an agency action is vacated is now final in your view? Like, what exactly are you asking us to hold? So, not just your case. This is going to affect a lot of other cases. So, the rule that we think is, you know, that most accurately captures this is where there is a district court decision that vacates an agency action and the complaint and the relevant count before this court is attacking that specific agency action, it is final and appealable. That is a very routine thing that happens in this court. So, you're saying that all of these remands, any remand that vacates agency action is non-final? Even though it's being remanded, going back to the agency, there's going to be more stuff happening, but it's final. If it vacates the prior agency action, that's not final in every case in that posture. So, I don't think so, Your Honor. And I think that's just the line between maybe the Pueblo of San Vista case and the American Great Lakes case is it depends on the, not just whether vacator occurs, but vacator and how the claim at issue is defined. So, it depends on the remedy. It depends on vacator. Vacator plus what is the scope of the claim that is at issue. And here, the scope of the claim is specific to a particular action on a particular date, not everything that could be litigated about the HIP program. And I think, you know, to the... This is a very difficult rule for us to adopt and implement. Well, I just, if there are concerns with that, I think there, we have a mirror callback rule that... I guess my question is why would we do this? Well, I think one of the reasons is because specifically when we're talking about Medicaid, you have a state that is not an ordinary party. It's part of a... Is this Medicaid specific rule you're asking for? So, I think if the court is uncomfortable with the broader rule I just proposed, it would be permissible to have a rule for cooperative federalism programs in which you have an agreement between two sovereigns and both are equally impacted by vacator of it. So, I think that would be the mirror rule. And, you know... But you're not equally impacted because you can still appeal later after the remand, whereas the government couldn't, the agency couldn't. Well, I think... That's the whole basis of the rules that we have in place. Well, I think that as the dialogue with Judge Millett illustrates, there is not a non-zero risk Indiana wouldn't be able to litigate this case to conclusion. And, that's exactly what the government faces whenever it has a remand. It may well issue a decision on remand that gets challenged and the government can then litigate the validity of its original action in any subsequent appeal, but there is no guarantee. And, that is precisely the problem that we're trying to avoid when it comes to practical finality. Can I ask you about the practical finality? So, if the district court had just remanded without vacator, what's your position on jurisdiction? I think we'd be in a very different position. Of course you are. That's why I asked the question. I just want to know yes or no. So, if it's remand without vacator, I don't think we would be here. That's not a legal answer at all. Analyze finality under the test you wish us to apply in a scenario where the district court's decision was just a remand. So, I think there, it depends on the scope of the claim. So, this case, I still think there would be a final decision because the claim is specific to the 2020 approval. And, so we're very much the situation as if the government wanted to appeal. There's no dispute. I don't think that that would be final and appealable. So, I think we are very much in the same position. Now, in terms of whether there is the same need to appeal, that may not be always the case. In the end, it's a decision on whether it needs to appeal. So, your position doctrinally is not limited to vacature situation. And, you say it's because there's a final resolution of a particular agency action, 2022 approval, which is going to happen 100% of the time when there's a remand. There has to be a final decision on whatever is being remanded. So, and to be clear, I think this course establishes two branches of remand orders that are final. One is effectively terminates the action. And, that doesn't depend on the remedy imposed. And, the second is, you know, is there a meaningful chance to appeal later? And, that I think is where the vacater comes in. Effectively terminates the action is a really weird argument when there's a 54B certification. But, you saw it because the whole point of 54B is that the action is not effectively terminated. This particular claim or this claim is to this party is terminated. And, it makes no sense to wait for everything else. So, I think, yes, your honor. I think when I say effectively terminate the action, it's with respect to the claims on which the district court entered judgment. Okay. Well, then that is 100% of remand orders. Because, as to the judgment that's remanded, it will be a decision that there was error by the agency that warrants vacature, or may not vacature, but warrants remand and action by the agency. It can't, that action cannot survive unless the agency fixes whatever problem was identified. So, I think now we're back in the area Judge Penn was worried about of how we would distinguish this case in a way that wouldn't be now not just remands with vacature, but 100% of remands. So, I think that is the court's concern. What I would direct the court to is a more narrow rule that addresses this case is where you have vacatur of an agency action impacting a bilateral agreement between two sovereigns, either sovereign to federal government or the state can appeal. Okay. Thank you. And then I wanted to ask you, in that situation, I mean, you have put a lot of weight on vacature. I think for your narrower approach, that's what you're asking us to focus on. In this case, the district court has stayed its vacature order, not just during appeal, but during the remand proceedings, which is about as unvacated a vacature as I can conceive of. And you have pointed out in the letter, well, there is no stay as to the power accounts. That's because you asked for that in your joint motion for a stay from the district court. You agreed to the power accounts not being stayed. So, given that the vacature has no practical operation, except in one capacity where you agreed a stay was not needed, what practical effect could we lean on here to say that this one should be treated as final? So, I think when we're assessing finality, it's at the time the order is issued. No, that's not the court. This court's practice. We have assessed finality based on representations and oral arguments. And we have that in an opinion. So, that binds us. So, I think that goes... And if you're going to do a practical effects analysis, really, we're going to ignore the most relevant practical effects on which you're leaning on, the consequences of vacature for a partner in a cooperative federal state agreement? So, Your Honor, to address that more directly, one is when the parties sort of agreed on the contours of a limited stay, it was without prejudice to either party's ability to seek further review. And second, the further review... You've been allowed to seek further review. You surely cannot stipulate as to how we will decide any issue on that appeal. You have to know that going in. No, Your Honor. And that's precisely why there's... You were a smart attorney. You were aware of the remand rule. So, you knew what risks you were assuming. Well, Your Honor, and that goes precisely to the second piece, which is right now Indiana cannot operate the cornerstone of its HIP program power account. It's because you agreed to not have those stayed. That's a you problem. The state of Indiana, not you personally. But that's an Indiana strategic tactical choice and litigation problem. It's also a little hard to call it the cornerstone when it hasn't functioned for five years. So, maybe five and a half at this point. So, I'm not sure what we're supposed to do with that. Are we supposed to relieve Indiana of its strategic litigation decision and then use that as a basis for finding either a narrow or a broad exception to our remand finality rule? How we see the issue, Your Honor, is it goes, if at all, to mootness rather than finality. And the case is not moot because there's still a live dispute as to whether Indiana... What goes to mootness rather than finality? The stay goes to mootness rather than finality in our view. I thought you wanted us to do a practical effects analysis. I mean, that's the only way we get into it. We can do it because that's where the exceptions to the remand finality rule are. They're practical effects analysis. And so, I don't think it just goes to mootness. I think practical effects goes to the practical effects. And it's hard for you to lean on a practical effect as absolutely essential when you agreed you didn't need a stay of that. Well, there are two practical effects. One is it's going to inform what the government does on remand in terms of the rule it applies, and that's precisely what the government can use to appeal these types of orders. And secondly... The court's decision is going to inform what the agency does on remands. Correct, Your Honor. That's 100% of remands. And that is the exact situation in which this court has held the federal government can appeal, and we think when there is a federal-state agreement, the same rule should apply to the state as to the federal government. And in terms of... But why is that when you can still appeal and the federal government can't? I mean, I guess you had said in the Seventh Circuit maybe you couldn't, but our case law says you can appeal the remand order after the remand, and it's your choice where you bring your appeal, right? So you can just appeal here, and then you can appeal a remand order. So, Your Honor, one thing we can't, and maybe this helps, is one thing that is I think there's no dispute that no party can appeal after the remand is the decision not just to remand but to vacate the order for the duration of that remand. That has to be appealed now or not at all because however long any remand takes, and this is true in any category of cases, the court can't undo the vacater for the period, for the years in which the remand in any subsequent district court litigation, any future appeals may take. But if it's a non-event vacater, which is what we have here, a state vacater. I don't even know what your injury is. You don't have to change anything you're doing in Indiana. We do, Your Honor. In order to continue operating HIP without power account, the legislature had to enact a temporary piece of legislation that allowed continued operation. Was that this year or was that in 2020? 2025. Okay. Well, so they've enacted the legislation, so we're good. No, Your Honor. But you haven't been operating them for five years anyhow because of the pandemic. You haven't been operating them. When's the last time you operated one of these power premiums? That was before COVID, and the whole reason that we didn't operate them during that time was temporary legislative changes. We're a lot of years past COVID. I mean, still with us, but COVID crisis, pandemic. And you still, Indiana still chose not to reinstate these power premiums. Your Honor, we could not under the terms of an enhanced federal funding package. That's a choice. That's a choice. Indiana can say no to money. Certainly, and the agreement was we will not reinstate them while during COVID in any redetermination period, not forever. And now we're in the situation of asking, is this a forever thing or is this just a temporary COVID error, I think. Okay. And so, and you have said, Indiana made the choice that, well, we'll keep doing what we've been doing, no power accounts, while this litigation goes forward and the case is remanded. So, Indiana has already made the choice. I feel like I'm repeating myself here that power, we can do just fine without, maybe it's not our ideal dream, but we can do just fine operating our program as we have for the last five years until the remand is over. At which point, it's up to HHS what they want to do about these power premiums. And if it's going to, you say, influence their decision, then you will have an argument if it influences it in a way you don't like. You don't want to argue about this one here. You're going to want to argue about the operative decision and say, what were they doing? They were listening to this, in your view, erroneous district court decision. And it's arbitrary and capricious for them to have done whatever they do. That will be your argument. Or they will make a decision and you will be happy as a clam. And Indiana will have nothing to complain about. Well, I think, Your Honor, that question gets to one of the lingering factual effects. It is a world of difference under an arbitrary and capricious deferential framework whether you are the party challenging the decision or whether you are the party defending it. Here, we are the party defending it. If there's a new adverse decision, Indiana would be the party challenging it. Here is the one where you are challenging it. You want this litigation to go forward where you have to challenge. I assume you would be happier to defend on the next round if you like the agency's decision. Well, to be clear, I'm talking about there's a difference between challenging the agency decision not the district court decision. Okay. But it's applying the same arbitrary and capricious review that we do. But as this is a deferential standard, if you were the party challenging the 2020 approval or... I don't disagree that you're happier as an appellee or a respondent in any of these types of cases, but I'm not sure that's a justification for finality. Can I ask you a fact question? Absolutely, Your Honor. How many folks in Indiana are enrolled in the HIP program? Obviously, I can have... I'll be very impressed if you have the precise number today, but just roughly. I think roughly about 600,000. Okay. Okay. All right. And do you know what the current status of your application for another five-year extension on the Substance Use Disorder and Mental Health Program is? It's still pending, Your Honor. Okay. Okay. Can I ask you... I don't know if my colleagues have other questions or... I have another question, but please finish. Okay. While HIP-2 has 2.0, I guess you'd call it, has been in effect, how many individuals have been either denied enrollment because they couldn't make an upfront premium payment or have been kicked out for not making premium payments? So when we're answering that question, we have to distinguish between two periods of time. One is between 2015 and 2018, in which there was a different version of HIP, and then from 2018 to 2020 before COVID derailed everything. Because in 2018, the state made a couple of changes to simplify power counts and to recalculate how contributions are done such that for most people it dropped substantially. I just would like to know the total amount of people that have been kicked off. So before the 2020-11 report notes, I think there were, in the 2018 to 2019 period, there were about 5,000 that were kicked off, and that's about 1.4% of the total HIP population. 5,000 kicked off, but how many tried to enroll but couldn't because you have to pay a premium to actually get your first premium to get enrolled? Yes. So for the 2018 to 2019 period, there was no data on how many people did not enroll because of the contributions. But that was precisely one of the things that the 2020 report noted would need to be studied going forward because you couldn't rely on 20... A long time since 2019, so what's the study results? How many people? So the 2019 to 2020 data is not in... I'm not aware of anything in the record that specifically addresses how many people tried to, you know, were interested in enrolling but did not. But if you look at page... 2018 to 2020 is what I'm interested. You said you were going to do a study of the period that would cover that. If you look at page 1037 of the Joint Appendix, it provides the data on how many people were disenrolled in that period for failure to make contributions. It was 5,500 members. That's against a population of about, I think it was about 50... you know, over 500,000 at that time. Sorry, 5,500... Were disenrolled for failure to make contributions. That's less. 5,500. I have 5,000 from you. Okay. But we still don't have... You don't have the number or it's just not in the record? But Indiana does have a number for how many people were rejected from enrollment. It's not in the record and I'm not aware of the data. I thought you said they were doing a study. No, the report indicated that that data would need to be analyzed. I'm not aware of whether the report actually was completed with respect to that, you know, data category. Is there any reason to think it's lower than the 5,500? This seems really... I mean, really? I just...  You're doing this program in which enrollment is an absolutely essential feature and you're not keeping track of how many people are not allowed to enroll because of your... This is the whole point of the experiment is to test how this works. And so you have to know how many people... Not you personally again. You have to know how many people couldn't enroll because of the requirement to pay premiums. Otherwise, this isn't an experiment at all and that's a whole other reason for HHS to be concerned about reauthorization. So, Your Honor, I think part of this is a timing issue. The 2020 report comes out in April of 2020, at which point there is no longer premiums being charged. And it's, you know, sort of analyzing retrospectively data from 2018 and 2019. I am not aware of whether there was a survey conducted in 2018-2019 before COVID interrupted things as to whether people wished to enroll but did not because of premiums. The only data we have from that is for 2018, at which point Indiana made significant changes to the power account structure to lower premiums. It's not the practice of refusing to enroll people who couldn't pay premiums. That did not change. Correct, Your Honor. That did not change. What are the pre-2018 statistics? So, pre-2018, the... And if you look at... The Secretary talks about this on page 856 of the Joint Appendix, that there was 3.1% did not enroll for failure to make... or were disenrolled for failure to make contributions in 2016. That went down to 2.2% in 2018. How many were not allowed to enroll in the first place? I think one survey had a number of about 26,000 over a, I think, 18-month period. Okay. And that survey is a Indiana report? Of Indiana Commission? It was an evaluation, yes. Okay. Okay. I'm sorry. Thank you. So, on the question of whether you would have the opportunity to appeal the remand order after the remand, I had asked you about that because our case law says that you most certainly can do that. And you had responded that the thing that's actually final is the vacator. And it just seems to me that if the thing that's final is the vacator, why would you get to actually challenge the remand order, which is what you're trying to do here? And on the vacator order, we have a whole sort of set of legal standards for vacator. And in this case, there was arguments about disruption, et cetera, which is certainly something that should be considered. And the district court considered that and stayed the vacator. So, it just seems to me, number one, you're here trying to appeal the remand order when the only thing that you're actually saying is final is the vacator. But in this particular case, the vacator has no real effect. So, any arguments you would have had about vacating vacator just really carry no water here because it's all been stayed. So, there's not a separate remand and vacator order, Your Honor. They are part of the same order. It vacates and remands. As to the practical effects, we do think that, you know, the unable to appeal later, that's one branch of this court's cases, and that's where the vacator is significant. But you have to meet that standard. And so, I guess there's two parts of it for you, one being that you're conceding that you can appeal the remand order later. I guess you have to concede that because that's our case law. So, the only thing you're relying on is the vacator, but the vacator's been stayed. It's been partly stayed, Your Honor. And then as to the – but that's only one – The only reason it's partial is because that's what you asked for. Yeah, but I think that's only one branch of the case. The other is does it resolve the state claim in a way that – But you have to meet both. No, I think these are two separate cases, lines of cases. On the one hand, you have cases like, you know, long-distance telephone exchange, which is talking about can you appeal later or not in cases that allow the government to appeal when a private party might not be able to. And then you have the branch of cases like the American Great Lakes case that where all the parties agreed there would be future remand proceedings on the very rule that the plaintiffs were challenging. But this court said that the plaintiffs could appeal in that case because with respect to, you know, part of the rule, there wouldn't be future – significant future proceedings with respect to that piece. And that's where we are here. There's no direction for the agency to act in the Great Lakes case. There's no direction for them to act and no reason to think that they were going to act. We've got the antithesis of this here because the agency has said we're on it. We're going to issue a new decision. So, Your Honor, I think that may just go to how you're defining the claim. But I think this is like American Great Lakes. It doesn't fall within that exception. But I think – and this maybe just brings back to I think what is the narrowest way to resolve that. When you have an order that remands or vacates and remands either way, that agency – That's the narrowest way, Stephen. If there's an agreement between two sovereigns, the federal government and the states, either the party of the states or the federal government can appeal. Even when the two sovereigns agreed to have it stayed? Yes, Your Honor. Peyton's kept you up a little bit longer. Thank you so much. We'll give you some time for rebuttal. May it please the Court. Maxwell Baldy for the Federal Lease. My friend offered – I think I gave four different potential rules for why this case might be appealable now, why they might be called a jurisdiction. I don't think any of them work, but I want to talk through them. The first was the idea that if there is vacatur and final resolution of a claim, but this case has a lot of – this court has a lot of cases. Pueblo of San Diego is a great example where there's vacatur and remand and there's still no appellate jurisdiction because that is inherently an interlocutory order and it can come back and be resolved and the remand order will merge into the final judgment. Why isn't it – we have this strange exception that the government can appeal for practical reasons. It doesn't become any more final when it's the government versus Indiana appealing. But in the area of these cooperative state federal programs where essentially what has been invalidated is a contractual agreement between the government and a state. And so the state's half of that contract is just as much broken as the federal government's. And if you had true actual vacatur in effect, you know, you all are making your decision making, but you could have a state that's left with no Medicaid program. And it's going to have to deal with that while the remand is ongoing before the agency, and that would be extraordinarily disruptive. And you could halt a Medicaid program, could throw it into turmoil. Why wouldn't – if we had actual vacatur effects in a case involving – so you'd have to have a remand with vacatur. It would have to actually be vacatur effects. And it involves a cooperative state federal program where what is vacated is the contractual arrangements. Why wouldn't it make just as much sense to allow the state, whose ox really is deeply gored in that situation, to appeal just as much as the U.S. government? Because whatever appeal they can have later, they will have dealt with a year or two of having to completely reorder and revamp their entire system or just not have Medicaid for a year or so. Yeah. Let me address that in two parts. First, sort of the premise that Indiana might not have Medicaid, they would still have a state Medicaid plan. They would not be able to run their demonstration program, and there might be features under state law that require them to change some things. But, you know, I don't think it's accurate to say that Medicaid would disappear in Indiana. Maybe I'm wrong. If you have a demonstration program, at least one like here that made the whole expansion possible, that's a lot of change. Let's assume their basic plan would just go forward. There's still tens of thousands, maybe 100,000 people that are thrown off, in their view. I'm going to say their actual vacature here. Let's imagine a different state, an actual vacature order that's not stayed. And as a result, 100,000 people who have been able to receive Medicaid under the experimental program will immediately be thrown off when that experiment goes away. Can they appeal to it or not? I think that would be a compelling reason for the district court to remand without a vacature or to stay a vacature order. But if that hasn't happened, why aren't they – this is a practical effect. The only reason the government gets an appeal is practical effects. I'm not quite sure that's true. In Pueblo of Sandia, this court described the rule that the government gets to appeal, and that exception is an application of the collateral order doctrine. It said remand rules as a category are not final. But because there's an asymmetry, the federal agency gets to appeal because there's no way for it to take the case back to court. It's just definitely not meeting the Cohen factors because it is not separable from the merits. It is the merits that you're appealing. Well, no. What we're appealing on remand – what's being appealed on remand is this question of, you know, what standard we need to apply or what extra – what additional explanation we need to apply. The merits of the case. This is count one in the case. If you were – had chosen to appeal on the merits, then you would be arguing the merits of the district court's decision and of the ruling on count one of the complaint, would you not? In fact, you have done that in your brief here. I hear – I understand what you're saying. I can't change the analysis that this court hasn't expressed it in college. I get that. That's on us. But it's not – I don't know that we can sort of say Indiana's out just by looking at Cohen factors. So then I would point to if you're talking about the practicality and you're looking at why – the rationale for why the federal government gets to appeal here is not that it has – it's that it's sovereign or that it has a particularly strong interest or that there would be particular effects. The rationale is done sort of on a categorical, not case-by-case basis, and it's based on the idea that the agency can't challenge its own acts complying with the remand order. So if the agency thinks on remand it's been instructed to do something contrary to the statute, it reaches – it has to comply with that order, and it reaches a new decision and puts it out, it might just be stuck with that. No other party brings that to court. Can we separate the vacature from the substance of the remand order? Like why doesn't a vacature order meet the Cohen factors? It's conclusive. It resolves an important question if thousands of people are going to be thrown off Medicaid, and it's effectively unreviewable on appeal. Like why can't a vacature order be appealed? I don't think it's accurate to say that it's effectively unreviewable on appeal. It would, you know, all interlocutory orders merge into a final judgment. But it's effectively unreviewable because once you vacated it, by the time you come back after remand, all these people have lost their insurance. So I would look to the example of, like, a preliminary injunction, which Congress had to create a separate provision. It needed 1292A to make preliminary injunctions appealable. It wasn't just they fit into 1291 because they're effective, you know, the effect of the preliminary injunction halting some action during the pendency litigation is – I think preliminary injunctions are hard to fit under Cohen. I'm just saying why don't vacature orders fit under Cohen? Well, I'm saying I think they're – in many ways they are analogous, right? It's a coercive order telling – Well, preliminary injunctions deal with the merits, whereas a vacature order has a sort of different set of legal things that are more based on practical effects. It's like the allied signal test is not based on the merits of the action, whereas preliminary injunctions are. So it's separable. It's an important question separate from the merits. I suppose – so if we were to look at this sort of order, which in the same sentence or, you know, two sentences in a row vacates and remands, what I would say is that you look at cases where you have vacature and remand, like Pueblo of Sandia, and the court has reached the same result and said that these are separate – the fact that there's sort of two dispositions doesn't change the fact that it is a remand order. And here's the point of the – It makes the argument there that the vacature has all the effects that this one does. I mean, in that case – Well, I guess we would have to look at this – if it's Cohen, it would have to be categorical. So we would have to say vacature orders are a category of things. Right. That it's important that we allow. And that's another reason why I think the cooperative federalism idea doesn't work, because that's sort of party-specific, and it's specific to the, you know, equities of a case. Again, a great reason to stay a vacater or to not vacate, but not necessarily sort of the categorical analysis that wouldn't just open up a whole wide swath of orders. Is practical finality different or the same as Cohen? Because we've already talked about you've got a huge problem with the government even appealing if we have to go through the Cohen factors. I don't know that the Supreme Court has said that's how we look at practical finality. But maybe you've got a better read on it. So, I mean, I think we don't go through it in every case because this Court has just said as a category this exception exists. And, you know, if we were to litigate it from first principles. I think there's zero percent of times where the government appealing the merits of the district court's decision would be separable from the merits. Let me give you an example that I think might work. So, take a case where you have, take a FOIA case where there's an issue of adequacy of the search and it's remanded for a new search and the government appeals. That is not the ultimate merits question of whether the government has, you know, disclosed documents properly and made proper withholding. It's a question of sort of this partial question of what sort of search needs to be done. It's not a final resolution. That's the merits issues we decide in FOIA cases all the time. It is a merits issue, but it's not a sort of the final end-all, be-all merits question, right? You would still have a whole lot of other analysis in a FOIA case. Has anyone ever said we look, I'm not even sure how we decide what the final be-all, end-all question is, because the answer to what documents you get is going to depend on what process the agency did or is supposed to do. So, I'm not sure I understand that, Tess. I'm just asking more doctrinal questions. I know this is, I mean, I've all been wrestling with this, I think. But I just, it seemed like your approach was that there is no practical finality doctrine. There's finality and there's COIN. No. Okay. So, are there three categories or two? Is it finality, COIN, practical finality, or just two? I think you can look at finality in a practical way, and there are cases where, you know, the kind of cases where courts wrestle with practical finality are things like, the court has resolved most of the case, but there's, like, a lingering fees issue, and there's been any number of Supreme Court cases trying to figure out what sort of fees qualify. There are Supreme Court cases about, you know, when they review state court judgments, and the state Supreme Court sends it back to the state trial court for entry of judgment, and the state court has said that's practically final. I don't think that's the sort of circumstance we have here, where, again, the district court resolved very little here. It certainly said that this was an, you know, that the approval wasn't adequately justified, that the secretary didn't explain, look at the data and explain his decision in enough depth, but the district court also said, I'm not looking to the reasonableness of the decision. I'm not looking to the underlying data. I'm reaching this decision solely on the basis that there's just not enough here in this explanation. Go back and try again, and the agency has said that it will go back and reevaluate it, and that's, you know, I think it's a classic remand. And to the extent that we're talking about the practical finality in this case by itself, I think, Judge Millett, as you pointed out, the stay of the vacator does a lot of work there because there really aren't practical effects other than the ability to charge premiums for power account in HIP plus. Can I just ask you to clarify what you think the rule is that our case has announced? You're basically saying that, and this might be right, the practical consequences, bad, good, and different are just irrelevant to the question of appealability. The question is just can you appeal after further proceedings on remand, and that's the end of the story. I think that is correct for the appealability of a remand order. The exceptions that exist are the government, the federal agency that rendered a decision can appeal because it would have no other opportunity to seek judicial review. That's Sierra Club, Knoxville Petroleum. There's the exception for when the only task left is ministerial. You know, there's a remand with sort of instructions. There's nothing left to do. But I don't think that— Yeah, so we also have this stray—I understand that. Right. We also have this language in our cases suggesting that it's okay because the party who's appealing now can appeal the remand order later. And it seems to me it's really hard to understand in practical terms what that means in a case like this. This doesn't mean necessarily this becomes appealable, but any time you remand for more explanation and then the agency gives a new explanation and either grants or denies what the party wants, they're not going to appeal and in this case come back and say, well, don't worry about why they denied it in 2026. They gave enough reasons in 2020. There's no way we would approach that case that way, would we? Well, so there's—the district court's analysis binds the agency. The agency can't go back and say, we're going to ignore your order. And so— And later, Indiana can't come to court and say, don't worry about anything that happened on remand. You just need to rule that the district court in 2024 was wrong, the initial approval was okay, and forget everything else that happened. That's correct. But Indiana can say in that challenge the agency's decision in—imagine that it went back to the agency and the agency rejected the application. Indiana could bring it back to court and say, you know, we think that the agency was wrong to challenge it, but it could also on appeal say the agency flipped its position and got it wrong because it was bound by this faulty remand order where the governing legal rule that it was required to apply was wrong. That's how it brings it back to court. But the decision doesn't make the agency wrong. No, but, Your Honor, if the agency— If the agency could approve or not. Yes, and I'm just suggesting that the option would be open to Indiana to argue that the agency was boxed in by this rule of decision that was simply wrong, and that's what it applied. And so my only point is that these questions can come back to court. That is the question I'm trying to make. Really, that one can't. The point is, as Judge Christie was saying, is that if we come up here on a new decision where the agency has done a whole bunch of analysis and given, you know, an ideal reasoned explanation for a decision to disapprove, we wouldn't say you have to approve. All we would say is, well, was that reasoned? We wouldn't go back and—even if the prior one was perfectly reasoned as well and the district court was wrong, that really doesn't matter, does it, as long as the decision before us is reasoned? So let me take an example from this case where the district court— and I want to be careful to not box in how the agency interprets the district court's order, but I think there's a way to read the district court's order to say that the agency shouldn't be looking to health effects. I'm not—just because I'm not trying to take a position whether that's what in fact it is. If the secretary were to enter a new decision and say, well, I can't consider health effects under the terms of the remand order, and therefore I don't think there's enough here to enter an approval, that's the sort of thing that Indiana could challenge. But, yes, with every case that is remanded, to get a new decision, to get further explanation for additional proceedings, there is a new decision, and you will look to that decision, but— You're basically saying if there's a wrong legal issue that the district court determined that guides the remand, then Indiana will be able to challenge that. That's correct. You know what they also could have done is asked for a 1292B certification, if there actually were a controlling question of law in this case like that. Yes, that's the mechanism Congress created for this type of issue. Can I ask you two questions? One is factual. Do you know what the status of HHS's review on the remand is, or if there's any—may not, but if there's any rough timetable or anything like that? So I know that it is before them, and I understand that at the moment they are waiting to see how this plays out. I'm not representing that they won't act because they haven't told me what they're going to do one way or another. Are they acting on waivers during the shutdown at all? I don't believe so, but I actually— So they're waiting for two things. Yeah, they're waiting for a couple of things. Okay. Do you have more questions? I had—I was really curious about the—what two-thirds of your briefs are spent on the merits, arguing that if we do find jurisdiction, we should vacate the district court's order. Did you guys file a notice of appeal? No. I'm assuming you and the Justice Department are acutely aware of boundless precedent from the Supreme Court and this court, holding that a party that wishes to change the judgment of the district court has to either file a notice of appeal or cross-appeal? Yes, Your Honor. It has to get that filing approved and authorized by the Solicitor General. Has the Solicitor General authorized that part of your brief? The Solicitor General has reviewed the brief, yes. Has the Solicitor General authorized an appeal? No, the government did not appeal. Then you can't—why is that—what is your rationale for why that argument is there without filing notice of appeal? So, Your Honor, the government is not seeking to invoke this court's jurisdiction to disturb the judgment of the district court. That's the conclusion of your brief? What we are saying is that if you were to reach the merits, that we are presenting our views in the proper way— So, if we find jurisdiction. Yes. If you find jurisdiction. If some party has invoked the jurisdiction of this court— You have to file a conditional cross-appeal. I mean, we've had Supreme Courts held a hundred times. A party can't stand there at that podium and ask us to change the district court's judgment without filing notice of appeal or cross-appeal or petition, whatever the case may be. And you don't get around that. This isn't an alternative ground for affirmance that you're advocating. And if the Solicitor General is going to do that, the Solicitor General has to own it and sign a piece of paper that says appeal or cross-appeal and make that final decision. I don't care if somebody in the office reviewed it. It has to be authorized. And you're telling me that that argument to change the district court's judgment was not authorized by the Solicitor General. I am telling you that there is not a, you know, slip order in the Archives and OST saying, I authorize— It is not an authorization by the Solicitor General to seek to overturn the decision of a district court, conditionally or otherwise. Your Honor, the government has not appealed. You have the only—you have a whole—two-thirds of your brief is an argument that we define as an appeal. Please change the district court's ruling. If we had filed the other version of the brief where we had said nothing on the merits, the chances that I started the lectern and got a whole bunch of merits questions that we hadn't briefed and hadn't run through in the agency process and were going to do supplemental briefing, it's not, like, unreasonable. That's why you file a conditional cross-appeal. And this is that alien stuff. But without an—you've told us it's not authorized by the Solicitor General. I don't know why we shouldn't strike that entire two-thirds of your brief, even if we get to the merits. If you wanted to, you can also—if you wanted to view it as an amicus brief, you could. If you want to view it as whatever—this is the government's position. The court is free to consider it or not. Well, I'm very concerned about this process issue. But this is pretty settled law, and it seems like it's circumventing the rule of Solicitor General authorization for a decision. And the whole point of that process is to police when the government chooses to seek to overturn a district court's decision or not. Yeah. I want to be careful about how I characterize internal government deliberations. But what I will say is that the Solicitor General decided not to pursue an appeal in this case. Two different deputies to the Solicitor General have also reviewed the various filings the government has made. But I think the fact that the Solicitor General chose not to appeal means that you are not allowed to argue for a change in the district court judgment. If there's something wrong in my analysis, let me know. I—all— As Gregory said, we've got S.G. authorizations. All I can say is that, you know, the S.G. wanted these—the views in the brief before the court, and the court can consider those or not. Okay. All right. Thank you. The appeal should be dismissed. Thank you. May it please the court. Erica Turrett for Indiana Medicaid Beneficiaries, Monty Rose Jr., Chelsea Lang, and Emily Rames. In 2020, the Secretary approved an unprecedented 10-year extension of a Section 1115 project in Indiana. In doing so, he brushed aside years of uncontroverted record evidence demonstrating this same project had resulted in tens of thousands of low-income Hoosiers losing their Medicaid. This morning, I have two key points I'd like to address. First, for the reasons the government stated and as explained in our brief, this panel is bound by this court's precedent dictating there is no jurisdiction over Indiana's appeal. As your questions to Indiana make clear, this is a routine occurrence for this court. This court's precedent is manifest in Indiana's arguments as to why it should be able to end-run a categorical jurisdictional rule or unavailing. Second, if you do proceed to the merits, Judge Boasberg correctly determined the Secretary failed to adequately consider Medicaid's core purpose of providing coverage to those who cannot otherwise afford it. That makes the Secretary's approval arbitrary and capricious under the Administrative Procedure Act. This is the same textbook APA error the Secretary made when he approved Arkansas' Section 1115 waiver. And approval this court held was arbitrary and capricious in Gresham v. Azar. There's been a lot of discussion about jurisdiction this morning. And unless this court has further questions, I'd like to address Judge Millett's questions about coverage loss to Indiana. If you look at JA-1200, it makes clear that between 2015 and 2016, 46,000 people in Indiana were never enrolled because they could not pay a premium. An additional 13,000 people in that period were terminated from their coverage for not paying premiums. That's a full 29% of people who could have been denied coverage were because of nonpayment of premiums. Then on JA-1029, we go into the data from 2017 to 2018. In that period, Judge Millett asked Indiana whether the state had looked at the number of people who were never enrolled but for not paying a premium. The state did not study that during that period. But for people who were actually terminated from coverage, it was an additional 26,000 people terminated for nonpayment between 2017 and 2018. Have there been any studies of – because that's the one that involves HIP 2.0, that time period. Sorry, Your Honor? That second time period involves HIP 2.0? Do I have my dates right? Yes, HIP 2.0 was approved in 2015. So that whole time period covers HIP 2.0. Okay, so did it take effect in 2015? When you talk about statistics from 2015 to 2016, does that include HIP 2.0? Yes, that's all under HIP 2.0. All right. Are there statistics of how many people were denied coverage after 2016 to 2020, I guess? Yes, we have statistics from 2015 to 2018. And we have some initial data from 2018 to 2020. But as Indiana indicated, that data is smaller. But numerous commenters alerted the Secretary to the fact that the barriers posed by premiums continue to be present. And you'll also see that type of information in the amicus brief from the American Public Health Association. I had a question with respect to the retroactive coverage issue. So Mr. Rose says he has medical debt from before he enrolled in HIP due to emergency room visits, but doesn't say whether any of those visits were in the three-month period that would be covered by retroactive provision. And Ms. Rames says, if I'm saying her name correct, Rames has unpaid bills from before she was enrolled with HIP, but again doesn't say that they were incurred within the three-month period. So I'm trying to understand whether you have demonstrated standing as to that particular argument. Correct, Your Honor. First, as Judge Boasberg explained, you don't need to reach that in order to find that the plaintiffs have standing to challenge HIP as a whole. But with respect to retroactive coverage in particular, if you look at someone like Ms. Rames, she could be terminated for nonpayment of premiums because her income is above 100 percent of the federal poverty line. Because she has ongoing health issues, that means that there's a substantial probability that if she were terminated, she would undergo expenses in the three-month period following termination. So in our view, that's the correct way to view it. So since there's no more lockout period, I thought if she gets terminated on Tuesday, she can apply again Wednesday. Yes, Your Honor, but not if she can't afford to pay the premiums. If the waiver approval in totality, including with respect to premiums, were to go back into place, that would mean that someone like Ms. Rames would need to pay a premium in order to be back enrolled. And so our position is that if she cannot afford to pay premiums, she would go uninsured. I think that goes to the premium requirement issue. So it sounds like you do not have at least a good faith allegation that either of them has medical bills that cover the actual three-month period that preceded their enrollment. Correct, Your Honor. So you're arguing, I guess, a substantial risk that if so far they've been paying their premiums and they're still in, but if in the future they can't, then they'll be kicked off. So there's a risk of that. And then there's another risk that during that time period they're kicked off, they will incur medical bills. Your Honor, to take a step back, the plaintiffs haven't had to pay premiums, as this court noted, for five years, since 2020. So having to pay premiums now, again, would be a significant departure from the status quo and a significant expense. And, you know, no plaintiff could guarantee for sure that if terminated from coverage, that they would have certain expenses within that three-month period. But we think under this court's precedent, if you have ongoing regular health needs that you frequently receive medical care for, then there's a substantial likelihood that within three months you would have that. Is that precedent in this court? I can provide, Your Honor. You can send it in later if you wanted to relay things. Yes, Your Honor. I would point to cases like NDXL Ray Peacock, the District of Columbia, from 2012, and Association of American Physicians and Surgeons v. Sebelius from 2014. Are those in your brief? Sorry? Are those in your brief? Yes, on page 24 of our brief. Thank you. Thank you very much. That's helpful. Why wouldn't, if you have, I'll ask you the same question on jurisdiction, if you have here a cooperative state federal program that produces a contract between two parties, U.S. government, state government, and that contract is vacated by a court order, and let's imagine it's hypothetical state X, and they have an experimental program to address treatment of particularly expensive types of cancer. And so because the cancer treatments are so expensive, maybe some of them are experimental themselves that they want to let people in who maybe have, they don't want to go limited, they want to expand the number of people that can be covered by this. And a vacature would terminate that experimental program. And so while the remand is ongoing, people are not receiving cancer treatments, or suburethane dialysis, or life-saving prescription medications. Doesn't that warrant, isn't that about as practical a reason for recognizing finality as we could have? Your Honor, taking a step back, I think it's important to keep in mind that with respect to vacature here, that's the standard remedy under the APA when you remand. So if we were to treat vacature, remand with vacature and remand without vacature differently, that would cut a huge hole in this court's precedent regarding non-final remand orders. I'll also say with respect to that hypothetical, I would consider this court's decision in Melinda Therapeutics. There, the FDA had approved a new drug. The district court vacated the approval and remanded the decision back to the agency. Nexus Pharmaceuticals, the intervener, came in and talked about all the harms. It would not only not be able to market the drug during remand, it said, but also that ill patients would go without access to the treatment. And this court still said no jurisdiction. Yeah, but when the FDA makes an error in approving a drug, there may well be concerns with safety and effectiveness. There's no safety and effectiveness of a drug analysis or cancer treatments here. So I don't understand, it doesn't seem to present the same. That also wasn't a cooperative state program. You can't take the government side of the contract down without taking Indiana's side down as well. And so if they actually came forward and made a showing, people will die. Or people will have extraordinary health impairments. Sorry, we have this remand rule. That's not final enough. You can talk about that on your appeal later. Your Honor, we don't think that vacatur is determinative of the jurisdictional question, and this court has never viewed remand orders differently on that basis. We also think it's important to consider that here this is about a Section 1115 approval. It's not about the underlying Medicaid agreement between the federal government and the state. As the federal government indicated, that would be the state plan. So it's not as if vacating a Section 1115 approval disturbs the underlying Medicaid program. I hypothetically disturb this program, and the state's going to come forward and say, this is hugely consequential. Understood, Your Honor. And we think this court's rule is that a remand order that returns the core dispute to the agency to reconsider the decision for significant further proceedings is a categorical rule. We think practicality considerations are baked into the court's exceptions, and in your hypothetical, I don't see one of those exceptions applying. You don't, so we haven't recognized an exception like this yet. But, you know, initially we hadn't at all, and then we recognized one for the government, and then we recognized one for, well, the government agency's not going to do anything, so they won't be able to appeal later. So we have recognized practical exceptions. Have we said that list has been exhausted? No, Your Honor, but the government's exception is based on the idea that it will never be able to appeal its efforts to comply with the remand order, and the practical exceptions all are in cases where the core dispute was not returned to the agency for further proceedings or the agency wasn't going to act. So you, in the dialogue with Indiana, explained that this court has said that if the agency concedes an oral argument, for example, that they're not going to act, that that would warrant an exception. That's what happened in In Re, long-distance telephone, for example. So in all those cases where practicality as an exception has been baked in or recognized by this court, it's instances where the agency was not going to reconsider the decision on remand and where the court left discretionary room for the agency to act. Questions? All right. Thank you very much, counsel. Thank you, Your Honor.  Steward Gardo, we will give you three minutes for rebuttal. Thank you, Your Honor. Two points, one on jurisdiction, one on coverage. On jurisdiction, all parties accept that this court would have jurisdiction over the appeal if the government had filed a notice of appeal. We think that same rule should apply to states where there is a decision-impacting cooperative federalism program. They're just as affected by the federal government, if not more so, by any decision, and like the government, face the prospect of not being able to appeal if, for example, on remand, there's a new decision and for whatever reason the plaintiffs decide not to challenge it. And I don't think that because of that parity, I don't think the state factors into this analysis, but I would also just remind the court that if the partial stay is going to factor in, that does create a perverse incentive to seek disruption to create jurisdiction. On the coverage point, all of the data that the plaintiffs have talked about was either before 2018. That overlooks that as page 882 of the joint appendix notes, there was a substantial restructuring of the power account structure in 2018. That means you can't rely on pre-2018 data. And while there was an expectation that the secretary expressed on pages 755 and 756 that this issue would continue to be studied, at the time the approval issued, we now were into the COVID era where due to both special COVID era rules as well as just the general dissimilarity in circumstances in society where it was not possible to continue testing this aspect of the program until COVID ended. Have you resumed testing since COVID ended? We have not been able to, Your Honor. Not been able to or just haven't? We have not been able to because the special COVID era rules sort of blasted right up until we got the district court's decision in this case. And then at that point, maybe. Special COVID funding? So there was special COVID legislation that says states could not disenroll. There wasn't a reason you couldn't have done a study? Based on funding that was accepted at the beginning of COVID, there was no longer any contributions to power accounts being charged during that period. So the issue, there wasn't a factual material to study. A financial decision was made. Correct. And then at that, when COVID, those rules ended, we had the district court's decision that vacated the portions of the waiver that would be needed to implement those contributions and therefore have data to test. Okay. And then did you just say that the data from 2018 to 2019, years after HIP 2.0 was adopted, doesn't track the operation of HIP 2.0? I'm sorry. Pre-2018 data, which is all the data that the plaintiffs are pointing to, can't be used to assess HIP 2.0 post-2018 because in 2018, there were major structural changes done to power accounts that had the effect of lowering premiums to $1 for about half of the population, and that simplified the whole structure to address some of the concerns that commenters had raised about sort of the pre-2018 operation. Any questions? I mean, thank you so much to all counsel. The case is submitted.
judges: Millett; Pan; Garcia